CASWELL v. LENSING & BENNETT.
(No. 5538.)

(Court of Civil Appeals of Texas. Austin. Dec. 8, 1915. Rehearing Denied Feb. 9, 1916.)

1. LANDLORD AND TENANT ☞244, 252 — LANDLORD'S LIEN—INNOCENT PURCHASERS.

A landlord's lien upon crops grown, being by statute and existing without any instrument in writing, need not be recorded; and a purchaser of crops from one who secured them from the tenant is charged with notice that they may be subject to a landlord's lien.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 984, 1002, 1022–1026, 1029; Dec. Dig. ☞244, 252.]

2. SALES ☞1—WHAT CONSTITUTES.

Where a landlord authorized his tenant to sell cotton grown on the demised premises to one who had made advances to the tenant on condition that his landlord's lien was discharged, and the tenant, an ignorant negro, delivered the cotton to the purchaser stating such agreement, and objecting that the purchaser took the cotton and refused to satisfy the landlord's lien, there was no sale, but rather an unlawful appropriation.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1, 3–5; Dec. Dig. ☞1.]

3. LANDLORD AND TENANT ☞254 — LIENS — WAIVER.

A landlord allowed his tenant, an ignorant negro, to dispose of cotton raised on the demised premises to one who had made advances to the tenant under an agreement that the landlord's lien should be satisfied out of the proceeds. The purchaser took the cotton, but refused to satisfy the entire landlord's lien, giving the negro a check for the rent only. Held, that the landlord, by cashing such check, did not waive his lien; the landlord having objected to the whole transaction, and shortly seizing the cotton under judicial process.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 986, 1034–1044; Dec. Dig. ☞254.]

4. LANDLORD AND TENANT ☞252 — LANDLORD'S LIEN—WAIVER.

While a landlord, by allowing his tenant to manage and sell the crops, may waive his landlord's lien for advances as against a purchaser from the tenant, a purchaser from a bankrupt company, which purchased the cotton from the tenant, was not entitled to priority over the landlord's lien, the landlord having consented to his tenant's sale to such company, which had made advances to the tenant, only on condition that his landlord's lien be first satisfied out of the proceeds, and there being nothing to indicate that the landlord allowed the bankrupt company to do anything showing authority to sell farm products in which he was interested.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 1002, 1022–1026, 1029; Dec. Dig. ☞252.]

Appeal from Milam County Court; John Watson, Judge.

Action by A. Lensing and T. J. Bennett, copartners against W. T. Caswell and another. From a decree for plaintiffs, the named defendant appeals. Affirmed.

Henderson, Kidd & Gillis, of Cameron, for appellant. E. A. Camp, of Rockdale, for appellee.

KEY, C. J. The nature of this suit is disclosed by the trial judge's full and correct findings of fact, which are as follows:

"Findings of Fact.

"(1) The court finds that the plaintiffs, Lensing & Bennett, are a firm composed of A. Lensing and T. J. Bennett, and that said firm owned a farm in Milam county during the year 1912 and 1913, and that they rented a part of said farm to Tex Slater for the year 1913, and that said Slater took and worked said land as their tenant during the year 1913, and raised a crop thereon, including the 5 bales of cotton in controversy; that to enable the said Slater to make a crop on said land during the year 1913 the plaintiffs, as landlords, furnished money, advancements, and supplies to the said Slater during the year 1913, amounting to the sum of $206.10, and that none of said amount had ever been paid to plaintiff, and that the said Slater was during that time, and now is, wholly insolvent.

"(2) That the German Mercantile Company was a corporation doing a retail business dur-

ing the year 1913 at Thorndale, Tex., Milam county, and that M. B. Leach was its duly authorized agent and general manager. That about December 20, 1913, application was filed in the United States court to have said company adjudged a bankrupt, which application was granted, and a receiver was appointed, and that all of the property and assets of said company were disposed of through said bankrupt proceedings, and by said bankrupt court, and said German Mercantile Company is now wholly insolvent, and is a defunct corporation.

"(3) That W. T. Caswell was a cotton buyer and resided at Austin, Tex., and during the year 1913, was engaged in the business of buying cotton from various parties, including the German Mercantile Company, and that one Schultz was Caswell's agent, and resided at Taylor, Tex.

"(4) That said Slater traded on account with German Mercantile Company during the year 1913, and said company had a mortgage on said Slater's 1913 crops, and that in the fall of the year Slater gathered his crops and sold a goodly portion thereof to the said German Mercantile Company, with the knowledge and consent of plaintiffs, the proceeds of which were applied on Slater's account to said company. That early in November, 1913, the plaintiffs notified Slater they would have to be paid before any more of the cotton would be permitted to be sold, and thereupon Slater gathered the 5 bales of cotton in controversy, and it was agreed between Slater and plaintiffs that Slater should carry said 5 bales of cotton to Thorndale and sell them to the German Mercantile Company, and plaintiffs would be paid their $206.10 out of said cotton. On November 6, 1913, Slater carried the five bales of cotton to Thorndale, had them weighed, and took samples and tickets to the German Mercantile Company, and gave them the written statement of plaintiffs of the amounts due plaintiffs by Slater, and asked said company to buy said cotton, and give Slater the money due Lensing and Bennett; Slater telling said company the instructions which had been given Slater by plaintiffs and their agreement. M. B. Leach, acting for said company, took the cotton tickets and samples, figured up the amount, and gave to Slater a check for the rents out of the 5 bales of cotton, being one-fourth of the proceeds, and told Slater that he would fix the rest of it with plaintiffs. To this Slater protested, and insisted that this was not satisfactory, and that he wanted to carry the money back to plaintiffs. Slater was a negro, and did all he reasonably could do to get the company to pay the money without a disturbance of the peace, telling Leach that if he (Slater) did not carry the money back that Lensing would whip him. Leach finally told him that the company would keep the cotton, and that they would give Slater credit on his account for the proceeds, and that he would later settle with Lensing and Bennett. Slater returned to plaintiffs' farm, and gave to plaintiffs the check for the rents out of said cotton which had been given by the company, and reported to the plaintiffs what had been done and said by Leach. The next morning plaintiffs called Leach by phone from its farm, which is about 15 miles from Thorndale, and Leach at this time promised to pay plaintiffs the $206.10 if plaintiffs would send for it; and plaintiffs told Leach that they would send the negro for the money that day, and that same day plaintiffs sent the said Tex Slater back to Thorndale for the money, and Leach again refused to pay it, and on the following day, Saturday, November 8, 1913, Lensing went to Rockdale and again phoned Leach, but could get no satisfaction from Leach, and Lensing then took the train and went to Thorndale and personally saw Leach regarding the matter, and at this time Leach told Lensing that the cotton had been sold and was then in Liverpool, and

that the money could not then be paid, but if Lensing would get Slater and bring him back to Thorndale, with itemized statement of plaintiffs' account, that the company would pay it. Lensing would not agree to this suggestion, and went out and located the 5 bales of cotton at the cotton compress in Thorndale. Lensing then went to the bank and tried to cash the check which had been sent him for rents, but the bank declined payment of the check on account of no funds. Lensing then returned to Leach and threatened to have him arrested for giving checks on the bank without funds, and thereupon Leach paid to Lensing in cash the amount called for in said check and the check was destroyed. Lensing then returned to Rockdale on the night train, and the next morning engaged his attorney to bring suit, and on the next Monday, November 10, 1914, the plaintiffs brought their suit against said Slater and the German Mercantile Company for the amount of the debt, and for conversion and foreclosure of the landlord's liens, at the same time getting out writ of sequestration, and having the 5 bales of cotton in controversy sequestered, and the 5 bales of cotton were taken possession of by the sheriff of Milam county on November 10, 1913; the sheriff taking the cotton from the possession of the Compress Company, not knowing who it belonged to, but the Compress Company was holding the cotton for Caswell.

"That suit was filed in the county court, and at the December term, 1913, plaintiffs secured judgment against Slater and the German Mercantile Company for $206.10 and cost of suit, together with a foreclosure on landlord's lien on said crops, and order of sale was directed, but before the sale was issued the said German Mercantile Company was adjudged a bankrupt, and trustees in bankruptcy took charge of the cotton in controversy. Later the trustees released any claim on the cotton, turning the same back to the sheriff of Milam county, and thereupon the defendant filed his oath and claimant's bond, with Howard Bland and C. H. Burnes as sureties, and took possession of the cotton, and has appropriated the same to his own use; the cotton at that time being in possession of the sheriff, under the said writ of sequestration.

"(5) Slater sold the said cotton to the said German Mercantile Company for the sum of $283.50, and plaintiffs have received no part thereof, except one-fourth thereof, which was paid to them by said company for the rents out of said cotton, and which was paid after the cotton had been purchased by Caswell, and the cotton, at the time of the filing and approval of the claimant's oath and bond, was worth on the market of Thorndale, the sum of $275.

"(6) Plaintiffs did not consent for Slater to sell said cotton without Slater paying the rents and advancements, and plaintiffs did not consent for the German Mercantile Company to buy said cotton without paying the rents and advancements, and plaintiffs did not in any manner give its consent for the handling of said cotton, except as hereby above stated.

"(7) A. Lensing was the resident member and agent of the firm of Lensing & Bennett, plaintiffs, and was duly authorized to act as such. M. B. Leach was the agent of the German Mercantile Company, and was duly authorized to act as such, and Schultz was the agent of Mr. Caswell, and was duly authorized to act as such, and all of the transactions herein mentioned were conducted through said agents. The plaintiffs, defendant, and Slater all acted in good faith in all of the transactions.

"(8) On November 7, 1913, the defendant purchased from the German Mercantile Company 26 bales of cotton, which included the 5 bales of cotton in controversy, and said cotton was delivered to the defendant, and the full value thereof was paid by the defendant to the Ger-

man Mercantile Company. At the time of this sale Caswell had no actual knowledge as to where the cotton had been grown, nor as to who had raised it, and knew nothing about any mortgages or liens on the cotton, and nothing was said regarding it, and no inquiry was made regarding the title to the cotton, or regarding any lien upon it; Caswell merely purchasing the cotton, thinking it was cotton belonging to the company, and paying for it, without having any actual knowledge of anybody's claim upon the cotton, and without making any inquiry regarding same, Caswell purchasing the cotton in the usual course of trade, and there was nothing relating to the cotton in question or in connection with the transaction of this purchase to suggest to a person of ordinary prudence, acting as Schultz was acting, the necessity of inquiry as to title of said cotton, or as to whether the cotton was encumbered with liens. The cotton was purchased by Caswell, and was paid for by him, and was in his possession before suit was filed by plaintiffs, and before it was levied upon by writ of sequestration.

"Plaintiffs also had landlord's lien upon a cow and calf belonging to Slater, which Slater delivered to plaintiffs, and the parties to this suit have agreed that plaintiffs may keep said cow, and that said original debt should be credited with $40, the value of the cow.

"The original debt was $206.10, and after allowing this credit of $40, leaves $166.10 now owing by Slater to plaintiffs for advancements, money, and supplies furnished as aforesaid. That Caswell has disposed of said cotton, and that three-fourths of the value of said cotton is in excess of the amount due plaintiffs."

### Opinion.

On the foregoing facts the trial court held that the plaintiffs had not waived their landlord's lien by which their debt for advances was secured, and that the defendant Caswell was liable for the amount of such debt, and judgment was rendered accordingly, from which judgment the defendant has prosecuted this appeal.

[1] It is earnestly insisted by counsel for appellant that the facts referred to show that appellees had waived their lien upon the 5 bales of cotton, at least in so far as appellant is concerned; he having bought and paid for the same in due course of business and without any notice of appellees' rights. In reference to the latter point, it should be kept in mind that the landlord's lien upon the crops grown upon the rented premises is given by statute, and exists without any instrument of writing, and therefore it is not required to be placed upon record. Hence it follows that, as against such lien, no one can claim protection as an innocent purchaser, and therefore those who purchase farm products acquire no better title than is held by the person who sells the same. This is a sufficient answer to so much of appellant's argument as is based upon the fact that Caswell bought the cotton from the German Mercantile Company in due course of business and paid full value therefor, without notice of appellees' rights. He was charged with a knowledge of the law by which some one may have had a landlord's lien upon the property, and that he could not acquire title to it free from such lien, if it existed. In other words, with some exceptions not necessary to be referred to, the doctrine of caveat emptor applies to all sales of personal property, and therefore the purchaser of such property acquires no better title than his vendor had.

[2, 3] So it becomes necessary to determine whether or not, as against appellees, the German Mercantile Company had acquired perfect title to the cotton before they undertook to sell it to Caswell, and we think that question must be answered in the negative. If it be conceded that appellees conferred authority upon their tenant to sell the cotton, and that payment of sufficient amount of the purchase price to cover their debt was not a condition precedent to passing title to the property, still we are of opinion that what occurred between the Mercantile Company and the tenant was not a voluntary act of sale on the part of the tenant, but was rather an unlawful taking of the property by the Mercantile Company, without the consent and over the protest of the tenant, and therefore the transaction did not constitute a sale. Nor would it be proper to hold that what occurred afterwards between appellee Lensing and the manager of the Mercantile Company constituted a ratification of the unlawful appropriation of the property by that company. It is true that Lensing accepted from the company a certain sum of money in payment of the amount owing by the tenant as rent, but we are satisfied that by so doing he did not intend to waive the landlord's lien or any other right appellees had in reference to the tenant's indebtedness for advancements.

[4] If it be conceded that legal title to the cotton was vested in the tenant, and that the Mercantile Company acquired that title, the fact remains that the tenant's title was charged with the lien in favor of the landlord, and that the Mercantile Company acquired it subject to that lien, and when they sold the cotton to appellant he acquired no better title than they had and took it subject to appellee's lien. Gilliam v. Smither, 33 S. W. 984, Planters' Compress Co. v. Howard, 46 Tex. Civ. App. 291, 92 S. W. 46, Bank v. Bank, 114 S. W. 180, and Melasky v. Jarrell, 131 S. W. 857, cited and relied upon by counsel for appellant, are distinguishable from this case. Those cases hold, and the doctrine is sound, that a landlord may permit a tenant to so manage, control, and sell the crops raised by him as that he, the landlord, will be held to have waived his lien as against the rights of a purchaser from the tenant who has paid to the tenant the purchase price for the property, although the tenant may disregard the instructions given by the landlord as to the application of the purchase money after the property has been sold. In the case at bar appellant did not purchase the property from the tenant, but from the German Mercantile Company, and there was nothing to indicate that appellees had ever authorized that company to do anything tending to show that

the company had authority to sell any farm products in which appellees were interested.

So our conclusion is that appellees were entitled to recover, and the judgment rendered in their favor is affirmed.

Affirmed.